AO 91 (Rev. 11/11) Criminal Complaint                    AUSA Ann Marie E. Ursini (312) 697-4092

**FILED**
**10/29/2021**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ZIAD I. ZAYED,
        also known as "ABU IBRAHIM"; "ZEE"; or
"ABE ZAYED" and
MOSAS I. ZAYED,
        also known as "MUSAH" or "MUSA"

**CASE NUMBER:** 21 CR 00667
**UNDER SEAL**

Judge Harjani

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about September 19, 2019 through June 25, 2021, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s)s violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 371 and 2315 | Conspiracy to receive, possess, conceal, store, barter, sell, and dispose of stolen property valued at over $5,000, knowing the property had been stolen, unlawfully concerted, or unlawfully taken, and the property was moved across state boundaries after it was stolen, unlawfully converted, and unlawfully taken. |

This criminal complaint is based upon these facts:

X Continued on the attached sheet.

WILLIAM R. ZANDER
Special Agent, Federal Bureau of Investigation
(FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: October 29, 2021

_Judge's signature_

City and state: Chicago, Illinois

Sunil R. Harjani, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, WILLIAM R. ZANDER, being duly sworn, state as follows:

## I.    BACKGROUND

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI). I have been so employed since approximately July 2017 and I am currently assigned to the Joint Terrorism Task Force ("JTTF").

2.     As part of my duties as an FBI Special Agent, I investigate criminal violations relating to foreign and domestic terrorism. In the regular scope of my duties while assigned to the FBI Chicago JTTF, I have assisted in state and federal investigations pertaining to receipt and sale of stolen goods and have been involved in multiple investigations pertaining to the financial support of foreign terrorist organizations. I was previously assigned to a Safe Streets Task Force specializing in the investigations of criminal violations relating to homicide, gang activity, and the trafficking of narcotics.

3.     This affidavit is submitted in support of a criminal complaint alleging that Ziad I. ZAYED ("ZIAD"), also known as "ABU IBRAHIM," "ZEE," and "ABE ZAYED," and Mosas I. ZAYED ("MOSAS"), also known as "MUSAH" and "MUSA," (collectively, "the ZAYEDs") have violated Title 18, United States Code, Sections 371 and 2315. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging the ZAYEDs

with conspiring to receive, possess, conceal, store, barter, sell, and dispose of stolen goods, in violation of Title 18, United States Code, Section 371 and 2315 (the "**Subject Offense**"), I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

4.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, and information I received from people with knowledge regarding relevant facts.

## II.     FACTS SUPPORTING PROBABLE CAUSE

### A. OVERVIEW

5.     As described in more detail below, the ZAYEDs, with other co-conspirators, operated a fencing operation in Chicago. The ZAYEDs used WhatsApp, an encrypted messaging application, to disseminate up to date price lists of in-demand electronics to their customer base. From these communications and word of mouth, the ZAYEDs publicized their willingness to purchase new electronics for cash, including smartphones and smartphone accessories, gaming systems, and other home electronics. The people who sold goods to the ZAYEDs acquired electronics through a variety of means, to include using stolen identities, making fraudulent credit card purchases, or stealing cargo from trains or electronics stores. The ZAYEDs, with others, use Crestwood Electronics, Inc. and other business locations to receive,

inspect, repackage, and ship stolen electronic devices to resellers out of state and overseas.

6.     In some cases, the ZAYEDs purchased electronics after being explicitly told the electronics were stolen, as in the case of sales made by an FBI Undercover Employee ("UCE"), detailed below. Based on my training and experience, the pattern of purchases by the ZAYEDs, statements by the UCE related to his/her sale of stolen merchandise, the ZAYED's advertisements of prices well below retail for high end electronics, and the use of multiple and false sender identities on shipped packages, I believe the ZAYEDs were aware that their customers were selling them stolen or fraudulently obtained items and were purchasing such goods knowingly.

7.     As described below, the ZAYEDs used FedEx to ship the stolen items in interstate and foreign commerce. The ZAYEDs shipped merchandise from Crestwood almost daily. The ZAYEDs have used different and false information on their outbound shipping labels, including using different company and individual names, as well as addresses, as the purported senders of the packages. Law enforcement officers have confirmed through serial numbers, as discussed below, that several shipments from the ZAYEDs to their resellers contained stolen or fraudulently obtained goods.

<u>Businesses Operated by the ZAYEDs</u>

*Crestwood Electronics, Inc.*

8.     According to Illinois Secretary of State records, ZIAD is the president and agent for Crestwood Electronics, Inc. ("Crestwood"), and the business has an active

3

state license. Based on surveillance, Crestwood prominently displays signs in its storefront which advertise that it buys used cellphones and electronics. Although Crestwood engages in some in-store business activity (for example, repairing cracked phone screens), based on physical surveillance, financial records, WhatsApp chats, and interviews much of their business appears to be purchasing, re-packaging, and re-selling and shipping electronics.

9. Based on physical surveillance from January 2020 to present, Crestwood is ZIAD's primary place of employment and MOSAS is present at Crestwood approximately two to three days a week. Based on surveillance, both ZIAD and MOSAS appear to be involved in Crestwood's day-to-day operations.

## Zee's Trading

10. Zee's Trading Inc., according to Illinois Secretary of State Business records, is located the same address as Crestwood. ZIAD is listed as the agent and president of the Zee's Trading Inc. FedEx shipping records confirmed that ZIAD and MOSAS also use the "Zee's Trading" business name when shipping packages from the Crestwood address to locations outside of Illinois.

## Kiswani Trading

11. According to Illinois Secretary of State Business records, Kiswani Trading, Inc. (a/k/a Kiswani Tejara), was dissolved on August 9, 2019. A listing on the Illinois Secretary of State website cited MOSAS as the primary agent, president and CEO of the organization. Although records indicate that the corporation was dissolved in August 2019 and there is no physical storefront associated with the

business, financial records indicate that MOSAS opened a bank account at J.P. Morgan Chase on or around October 13, 2020 under the name Kiswani Tejara, an alias business name associated with Kiswani Trading, which shares the name "Kiswani", and that the account remained open and active as of June 2021.

### Company I

12.     Company I, located in Chicago, is, according to physical surveillance, an active business and CO-CONSPIRATOR 1's primary place of work. A search of Illinois Secretary of State Business records did not return results for a business license under Company I's name. Signs on the outside of the storefront indicate the store is a general merchandise, grocery, cellular, beauty supply, and clothing store.

## B. THE ZAYEDS' PURCHASE, SALE AND SHIPMENT OF STOLEN GOODS

### 1) September 2020 Railcar Thefts and Sales of Stolen Laptops

13.     As described below, in September 2020, the ZAYEDs resold and shipped stolen laptops from Crestwood to Company K, a New York-based wholesale electronics import/export company with a warehouse located in Brooklyn New York.

### August 31, 2020 Shipment

14.     On August 31, 2020, Company D[1] shipped approximately 505 new laptop computers from their facility in California by FedEx railway to a customer in New Jersey. According to FedEx records, the laptops arrived on a railcar in Hodgkins,

---

[1] According to open-source research, Company D is a Taiwanese multinational hardware and electronics corporation specializing in advanced electronics technology. Company D also maintains an American headquarters in San Jose, California.

Illinois on September 1, 2020; however, on September 4, 2020, the shipment was declared "Delay in Transit" by FedEx. Based on conversations with FedEx representatives and records from Company D officials, I know that the laptops never arrived at their intended destination in New Jersey. Company D later filed an insurance claim for 151 of the laptops, claiming a loss valued at $65,249.93.

15.     On September 9, 2020, in a WhatsApp group text, a Company K employee sent ZIAD and MOSAS a purchase order request which listed 144 Company D laptops. According to the purchase order from Company K, the ZAYEDs sold the 144 laptops to Company K for $47,200. Law enforcement agents also reviewed a purchase order sent from Company K to the ZAYEDs that included serial numbers for the laptops. Law enforcement compared these serial numbers with numbers provided by Company D and confirmed that the 144 laptops sold by the ZAYEDs to Company K were a part of the order of 505 laptops shipped by Company D and are believed to have been stolen from a railcar near Chicago, Illinois on or around September 4, 2020.

*September 15, 2020, Shipment*

16.     Separately, on or around September 21, 2020, the ZAYEDs resold and shipped approximately 519 stolen laptops from Crestwood to Company K.

17.     Records provided to law enforcement officials from Company D indicated that, on September 15, 2020, Company D shipped 251 laptop computers via rail from their distribution facility in California with an intended destination of Montgomery, New York. On September 16, 2020, 315 Company D laptops were shipped from the

California facility with an intended destination of Wilton, New York. Company D waybill records indicate that Company D hired a third-party logistics company, which in turn used FedEx freight, to ship the laptops. According to Company D records, the train arrived in New York; however, none of the laptops arrived on the train or to their intended destinations. According to Company D and FedEx records, the laptops were last confirmed on September 18, 2020, in a railyard near Hodgkins, Illinois. According to the Company D General Counsel, the total approximate loss to Company D for the laptops was $134,688.85.

18.     Based on a review of WhatsApp messages between MOSAS, ZIAD, Kirill Sokhonchuk[2] and others, on September 19, 2020, MOSAS, Kirill, and another employee of Company K ("Individual I") discussed how to price Company D laptops of the types shipped on September 15 and 16, 2020. As detailed below, MOSAS sent two photographs of the Company D laptop boxes in the group chat. The conversation included the following:

> MOSAS: [Sends two photographs of packages containing serial numbers matching Company D laptops]
> MOSAS: "Need price ASAP please."
> Kirill: "Large qty?"
> MOSAS: "Around 50pcs each", "Maybe little more"
> Kirill: "[Individual I] are u able to price it?"
> MOSAS: "Please fast"

---

[2] Kirill Sokhonchuk ("Kirill") is joint owner and operator of Company K. On October 19, 2020, Kirill was indicted in the Eastern District of New York for charges related to the smuggling of electronic devices, and he has since pleaded guilty. *See United States v. Sokhonchuk*, 20 CR 415. On the day of his arrest, Kirill stated in an interview with FBI that he did not know where the products the ZAYEDs shipped him came from but did not believe they were stolen. In another interview, Kirill told FBI that there had been times when he questioned the origins of the products received from the ZAYEDs and believed it was possible the items were stolen.

Individual I: "This can take $150"
[Individual I and MOSAS subsequently exchanged photographs and website links referencing the retail value of the Company D 14" laptop.]
Individual I: "They $280 retail"
[Individual I and MOSAS continued to discuss the price of the Company D 11.6" laptop]
MOSAS: "Price"
Individual I: "Second one I don't even see online anywhere I don't know any specs or retail $"
MOSAS: "Ok"
Individual I: "Not even on [Company D's website]"
Individual I: "If you have the specs I could have some idea but I'm just completely in the dark with second model".

19.     The photographs described above showed serial numbers of the laptops. Based on Company D record, those devices were part of the above-mentioned railway shipments.

20.     According to records provided by FedEx, on September 21, 2020, approximately 70 packages, weighing a total of approximately 1,800 pounds, were shipped from Crestwood via FedEx Ground to Company K.[3]

21.     Further review of the WhatsApp group messages determined that a purchase order, dated September 22, 2020, was sent to ZIAD and MOSAS from Company K. The purchase order detailed at least 36 unique types of electronic devices, and included the quantity, description, make and model, individual unit price of each device. It also included total price of each electronic device that Company K

---

[3] According to Company D's website, the laptop models weigh approximately 2.43 pounds and 3.75 pounds respectively. Using this estimate, without consideration of packaging materials, the approximate total weight of the laptops would be 1,600 pounds.

owed Crestwood. According to the purchase order, Crestwood sent Company K 519 new Company D laptops in two sizes.

22.     The purchase order also documented the serial numbers for the 519 Company D laptops. Using records provided by Company D, law enforcement confirmed via serial number that 518 of the 519 laptops originating from Company D's distribution facility in California, and subsequently shipped by rail through Chicago, were the same laptops sold by Crestwood to Company K.

23.     Based on the purchase order information from September 22, 2020, ZIAD and MOSAS agreed to sell Company K 235 Company D laptops for $125 per unit. The purchase order indicates the other 284 Company D were priced at $150, which was the discussed amount between MOSAS, Kirill, and Individual I in the WhatsApp group text from September 19, 2020. The total sale for the 519 laptops was $71,975.[4]

2)  September 2020 Railcar Theft and Sale of Digital Cameras

24.     As detailed below, in September 2020, approximately 160 digital cameras were stolen from a railcar. Law enforcement agents determined that 150 of the digital cameras were subsequently resold and shipped by the ZAYEDs to Company K.

---

[4] According to open-source research, the retail value for one Company D laptop was approximately $210 and the other was approximately $270. Company K bought the first model laptop for approximately 40 percent below retail value, and the second model laptop for approximately 45 percent below retail value.

25. On or around August 31, 2020, approximately 160 digital cameras were shipped, via FedEx, from a facility associated with Company H[5] to a customer in Hazlet, New Jersey. According to records provided by Company H, the total retail value of the digital cameras was $319,000. Tracking records indicate that the FedEx shipment was last observed as "in transit" near Hodgkins, Illinois on September 3, 2020. According to a BNSF Railway[6] police report dated on September 6, 2020, investigating officers in Hodkins, Illinois observed the seal broken on the railcar, and the container carrying Company H's digital cameras was empty.

26. According to the WhatsApp group text, on September 10, 2020, Company K sent a document to ZIAD and MOSAS confirming the purchase of, among other items, 150 Company H digital cameras. Serial number records provided by Company H compared against a purchase order, obtained from Kirill's phone and sent from Company K to the ZAYEDs, confirmed that the 150 digital cameras sent by the ZAYEDs to Company K were the same cameras shipped by Company H and later stolen.

### 3) October 2020 Railcar Theft and Sale of Fitness Tracking Devices

27. As described further below, on or around October 7, 2020, a railcar traveling near Chicago was accessed and approximately $860,000 worth of fitness tracking devices were stolen. Within days of the theft, the ZAYEDs acquired,

---

[5] According to their website, Company H manufactures high quality cameras used in the film and broadcast industries, among others.

[6] According to their website, Burlington Northern Santa Fe Railway Company, or "BNSF," is one of the largest freight railway networks in North America.

repackaged, and shipped over 1,000 of the stolen fitness tracking devices to Company K in New York for resale.

28.     According to information from BNSF Railway Investigators, on or about October 5, 2020, a shipment of electronic fitness tracking devices was sent from Company C[7] in Plainfield Indiana, to Company A's distribution center in Dinuba, California.

29.     According to security officials from Company B, which manufactures the fitness tracking devices, Company A placed an order for 5,736 fitness tracking devices. Company B furthered identified that a variety of fitness tracking devices, in total 4,886, were stolen, for a total loss to the company of approximately $829,155.70.

30.     On or about October 13, 2020, upon arrival of the BNSF cargo train in Richmond, California, BNSF employees discovered an unsealed and empty shipping container at their distribution facility. According to a report by a BNSF Railway Special Agent, the doors were open, and the container was empty. According to waybill records, the container should have contained approximately 2,700 pounds of fitness tracking devices bound for Company A. BNSF records indicated that the container was last confirmed as closed and sealed on or about October 6, 2020, in Chicago, Illinois.

31.     On October 7, 2020, in the WhatsApp group text, MOSAS shared three photographs of Company B fitness tracking device boxes to the group. Individual I

---

[7] According to Company C's website, they are a distributor of information technology products and specialize in supply chain services.

stated, "On phone you said potentially thousands of all 3 [Company B] models?" MOSAS responded with two messages: "Possibly don't have exact count," and "Price?" In response, Individual I implied it was difficult to price one of the fitness devices, stating, "This not out yet I really have no way to gauge other than supposed to be $330 retail."[8] Individual I and MOSAS discussed various prices for all three fitness tracking device models, eventually agreeing on specific prices for the three different types of models: $25-30 for one model, $85 for another model, and, for the most expensive, new model, they settled on 65 percent of the potential $330 retail price.

32. According to information provided by FedEx, on or about October 7, 2020, 79 boxes were shipped from Zee's Trading, at its address in Crestwood, Illinois to "Dennis Kirill" at Company K.[9] On October 19, 2020, in conjunction with the arrest of Kirill and search of his business, law enforcement seized approximately 23 pallets of electronic goods and materials during the execution of a search warrant at Company K's warehouse. Included in the seizure were 1,805 of Company B fitness tracking devices. All 1,805 fitness devices serial numbers were on the list of stolen devices provided by Company B. While most of the FedEx shipping boxes containing the fitness devices had their labels removed or destroyed, one of the shipping boxes had a shipping label on the outside of the box with tracking number:

---

[8] According to open-source research, Company B released a new model of fitness tracker in late September 2020, consistent with Individual I's claim that the device was newly released. The retail price of the electronic device appeared to be approximately $300, consistent with Individual H's claim in his WhatsApp message.

[9] I believe "Dennis Kirill" is a false name combining Individual H and Kirill Sokhonchuk's names.

397604903809.The sender was listed as ZIAD ZAYED, ZEES TRADING INC, at Crestwood's address, and listed telephone number 7089719622 ("the -9622 number"). T-Mobile records show that ZIAD is the subscriber for the -9622 number. FedEx Ground records show that this tracking number was shipped from Crestwood on or about October 7, 2020.

33.     Based on my training and experience, the totality of the above-mentioned information, and evidence obtained from search warrants described in further detail below, the fitness tracking devices stolen from a BNSF railcar were resold to Company K by ZIAD and shipped within a day of the theft to New York through FedEx.

<u>January 2021 Undercover Sale of iPhones</u>

70.     On January 21, 2021, an FBI UCE entered Crestwood, while wearing an audio recording device. The UCE saw ZIAD, matching the physical appearance and general description of ZIAD, based on the UCE's review of ZIAD's driver's license information and photograph maintained by the Illinois Secretary of State, sitting at a table behind a glass partitioned enclosure. Situated near ZIAD was a large television screen which appeared to display a list of electronic devices and the prices paid for a device. The UCE also saw an individual matching the physical appearance and general description of MOSAS, based on the UCE's review of MOSAS's driver's license information and photograph maintained by the Illinois Secretary of State, stacking merchandise on shelves in the back of the store.

13

71.     As the UCE approached ZIAD, ZIAD greeted the UCE. The UCE and ZIAD talked about 12 new Apple iPhone 12 Mini's that the UCE wished to sell to ZIAD. According to the UCE, the computer screen ZIAD referenced displayed prices for electronics in a spreadsheet-like format.

72.     According to the UCE, ZIAD stated he would buy the Apple iPhone 12 Mini's for $545 per device. An open-source search indicated that the retail price of the Apple iPhone 12 Mini was approximately $699.

73.     During the meeting, the UCE asked ZIAD to "open [the phones] up and pop me the SIMs out."[10] According to the audio recording, ZIAD appeared to ask the UCE a question, to which the UCE responded "just give me like four or five [SIM cards]."[11][12] According to the UCE, ZIAD opened the original packaging on the cellular devices, removed approximately four new SIM cards, and gave them back to the UCE. Based on the UCE's training and experience, my training and experience, and in the context of this transaction, "clean" SIM cards are desirable because they can be used to obscure the true identity of the user. Additionally, the UCE's request for the SIM cards is an unusual request which would made or met during a legitimate sale. ZIAD

[10] SIM is an acronym for Subscriber Identity Module card; according to open-source research, SIM cards are tiny, portable memory chips which stores information and are commonly found in cellular devices.

[11] Bracketed text contains the UCE's or my interpretation of certain communications. These interpretations are based on training and experience, a review of the recordings, the context of the conversation and other information including open-source searches.

[12] According to the UCE, ZIAD was seated behind a glass partitioned enclosure at the rear of the store. While the UCE could hear ZIAD during the in-person interaction, the audio recording did not pick up every response provided by ZIAD during the sale.

later used a money counter to count $6,540 in cash to pay the UCE for all 12 new Apple iPhone 12 Mini cellular telephones.

74. According to the UCE and the recording, the UCE subsequently asked ZIAD what price he would pay for Apple Airpods, should the UCE be able to acquire the headphones. ZIAD stated the price would vary, depending on the model. ZIAD told the UCE that his telephone number was the -9622 number. The UCE advised ZIAD that he/she would text ZIAD and then departed Crestwood.

75. Based on my training and experience, and the totality of events from ZIAD's interaction with the UCE, including the ability to confirm cellular device information associated to cellphone providers, the cash purchase of cellphone devices under retail price, and ZIAD's agreement to remove SIM cards appears, I believe that ZIAD knew he was purchasing stolen goods from the UCE.

<u>April 2021 UCE Sale of "Stolen" Airpods</u>

76. As explained below, the UCE returned to Crestwood on April 20, 2021, and sold Airpods to the ZAYEDs. During the sale, the UCE represented that the Airpods were stolen.

77. More specifically, according to UCE and the recorded meeting, on April 20, 2021, the UCE returned to Crestwood wearing audio and video recording devices. Upon entering the store, the UCE greeted a Crestwood employee.[13] The UCE greeted ZIAD at a counter at the rear of the store and the two exchanged pleasantries. While

---

[13] The Crestwood employee is known to law enforcement officials from his Illinois driver's license and through previous physical surveillance.

inside the store, the UCE observed several large brown shipping boxes, some of which contained the logos of large-chain electronics companies, television manufacturers, and home improvement stores. Additionally, the UCE observed FedEx shipping labels on some of the boxes. The individuals inside the storefront generally appeared to be in the process of packing and shipping several boxes.

78.     According to the UCE and the recording, ZIAD asked what the UCE brought to sell. The UCE placed a large, black trash bag on the counter containing 37 new Apple Generation 2 Airpods. The UCE told ZIAD that he/she had approximately thirty Airpods.

79.     According to the UCE and the recording, ZIAD removed several of the Airpod boxes from the bag and spoke in Arabic to MOSAS. ZIAD and MOSAS continued to speak in Arabic and inspected several of the Airpod boxes. An FBI linguist fluent in Arabic reviewed the audio and video recording following the UCE's recording from Crestwood. In a summary draft translation provided by the FBI Linguist, ZIAD and MOSAS discussed the quality of the Airpods, said the products appeared fake, and opined they might have originated from Mexico. ZIAD generally stated that even if the products were fake, they could still sell the Airpods in the store. Based on my training and experience and the context of this conversation, I believe the ZAYED's conversation indicates their willingness to purchase and sell illegally obtained products. MOSAS inquired if the UCE had a large quantity of goods to sell and told ZIAD to check a few of the boxes.

80.     According to the UCE and the recording, the UCE stated they could open some of the packages to confirm the contents of the boxes. ZIAD remarked they were inspecting the boxes carefully, because the Airpods usually come in a large box of ten. The UCE said his/her associate "hit a lick to get them"[14] and "the way he got them they ain't going to have no box."[15] ZIAD responded with "oh" and continued counting the Airpod boxes. The UCE further stated that his/her associate got a new job as a janitor. The UCE told ZIAD that his/her associate can pull out a box or two at a time of electronic devices from their workplace and stated that was the reason why the Airpods did not come in a case of ten like a normal store would sell them. The UCE told ZIAD the Airpods were all new.

81.     According to the UCE and the recording, ZIAD asked the UCE if there were fifty boxes of Airpods, and the UCE stated likely closer to thirty boxes. After counting all the boxes, ZIAD stated the exact amount of Airpods was 37 boxes. The UCE asked ZIAD if he still had a computer screen which displayed the list of all electronic devices and their prices. ZIAD confirmed that he still did have the electronic device list. The UCE asked ZIAD if his number was still the -9622 number; and ZIAD replied "uh huh" in confirmation.

82.     According to the UCE and the recording, ZIAD entered the back of the store, returned with a device that appeared to be a calculator, and referenced a

---

[14] According to the UCE's training and experience, "hit a lick" is a slang expression commonly referring to acquiring a lot a money quickly.

[15] The quotes from the recording of the UCE's meeting in this affidavit are drafts based on a law enforcement agent's review of the recorded meeting and are not final transcripts.

computer screen that appeared to contain a list of electronic devices and prices. ZIAD stated "I am going to need you to give me a better deal" referring to the Airpods. ZIAD said the Airpods usually go for $120 per box, but he could purchase them from the UCE for $3,700 total - $100 per box.[16] The UCE said that since ZIAD had helped him/her out in the past on other deals, the UCE would be willing to work with ZIAD this time. ZIAD said "I'll make it up to you" in future sales. ZIAD paid the UCE in cash.

83.　　According to the UCE and the recording, the UCE asked ZIAD what specific electronics were currently in demand and which ones the UCE could get the highest return. The UCE stated that he/she needed to know what goods to tell his/her associate to acquire in the future. ZIAD stated Apple Watches, iPads, laptops, generally all Apple products, and Nintendo Switches were in demand. The UCE confirmed that ZIAD said Nintendo Switches. ZIAD confirmed and said, you make good money on them, and further stated, "you could probably make like about $260 a piece and they like $299 in the store." The UCE replied that his/her associate could get products "for free cause he stealing" them. The UCE confirmed a second time that ZIAD would pay the UCE $260 per Nintendo Switch, and ZIAD responded "yeah."

### April 2021 Shipment of Fraudulently Procured Air Purifiers

84.　　On April 21, 2021, law enforcement officials executed a search warrant for 14 parcels shipped from Crestwood. The shipping label for each of the packages

---

[16] According to open-source research, the approximate retail value per device is $199. The total retail purchase price of the devices was $7,843.26.

listed the sender as: ZIAD ZAYED, ZEES TRADING INC, at an address in Crestwood, IL, and listing the -9622 number. The recipient for each package was: "Dennis Kirill" at [Company K], in Brooklyn, New York, and listed Individual H's telephone number.

85.     Law enforcement officials conducting the search observed the outside of some of the packages labeled with the logos of a large home improvement chain – consistent with logos previously identified on boxes inside Crestwood on April 20, 2021, as seen by the UCE and described above. Accordingly, I believe that some of the same boxes observed inside the store on April 20, 2021 were shipped from Crestwood on April 20, 2021 and searched by law enforcement agents on April 21, 2021. Additionally, agents observed that FedEx shipping labels had been removed from the outside of some of the boxes. Based on my training and experience, I believe this indicates that some of the original labels may have been altered.

86.     A search of the 14 boxes revealed approximately 200 electronic devices, including air purifiers, wireless headphones, smart home thermostats, digital smart watches, laptop computers, tablets, and car dash cameras.[17] After determining the contents of the boxes, law enforcement allowed the delivery of the boxes to be completed to the identified destination.

---

[17] According to information provided by the manufacturers of these devices, once a device is shipped from the manufacturer to the retailer, the individual devices are not tracked by specific serial number. Rather, large quantities of electronic devices are typically tracked by general model or product type. Because records were not maintained by the manufacturer for the electronic devices, the FBI was unable to determine the shipping history for most of the devices observed from the April 21, 2021 search.

87.     Included within the 14 boxes were approximately six Company E[18] Air Purifiers in original packaging. Open-source research indicated the retail price at the time for a Company E Air Purifier was approximately $1,199.99 at large chain electronics stores. Separate open-source research indicated that a seller on eBay listed as "brownbeartech" had the same make and model Company E Air Purifier listed for $949.99. According eBay records, the Brown Bear Tech seller profile listed Kirill as the subscriber and Company K as the associated business.

88.     Upon further examination of the air purifier boxes, law enforcement agents observed what appeared to be an original shipping label beneath the Crestwood shipping label, which contained a barcode, partial tracking number, and partial address. Additionally, bright yellow FedEx shipping tape with the repeating purple letters "SDR"[19] was wrapped around the outside of the packages. Prior to the search, the tape was cut along the edge of the package, indicating the box may have been previously opened. The shape and sizes of the packages were generally consistent with boxes observed by law enforcement surveillance being offloaded by CO-CONSIRATOR 1 from his vehicle into Crestwood on April 20, 2021. Finally, a label stating "Saturday Delivery" was affixed to the outside of the air purifier boxes.

89.     Between April 30, 2021 and May 7, 2021, FBI interviewed the individuals associated with the credit card numbers used to purchase the air

---

[18] According to open sources, Company E is a science and technology company headquartered in San Francisco that designs and manufactures air purifiers.

[19] According to open-source research, the "SDR" tape observed by law enforcement agents was consistent with FedEx's distinctive yellow and purple tape. According to FedEx records, SDR" is an acronym used by FedEx to denote Saturday Delivery.

purifiers. Each of the victims stated that they did not purchase an Air Purifier from Company E. Each victim generally stated that in early to mid-April 2021 they noticed several reoccurring fraudulent purchases on their credit card statements. The purchases were always the same dollar amount and made to Company E for the purchase of air purifiers. Each of the interviewed victims resided outside of the State of Illinois and were uncertain as to how their identity or credit card information was stolen.

90.     Purchase order receipts and transactional records provided by Company E confirmed that the six air purifiers were delivered in April 2021 to at least two separate addresses in Chicago. Open-source database checks and records provided by the property management company to law enforcement confirmed that the occupant of one of these addresses was Individual L. Open-source database checks confirmed that the second address was associated with Individual M.

91.     Information provided by Company E confirmed that the air purifiers were purchased in April 2021 from a device associated with the Internet Protocol ("IP") address: 208.59.188.125. Records from RCN Telecom Services LLC, confirmed that the subscriber of the 208.59.188.125 IP address was Individual L and that the account was active at the time of the air purifier purchase.

92.     On May 25, 2021, the FBI searched Company K's warehouse after obtaining verbal and written consent to search the premises and contents within. Identified in the warehouse were the same packages containing air purifiers previously observed from the April 21, 2021 search by law enforcement. The shipping

label information, the same "SDR" tape mentioned above, and tracking numbers further confirmed the air purifiers were the same packages previously shipped from Crestwood via FedEx Ground.

93.    On June 7, 2021, FBI agents conducted an interview with Individual L. Individual L confirmed that she saw boxes containing air purifiers delivered under her name to her residence. Individual L denied purchasing or re-selling the Company E air purifiers herself and directed interviewing agents to speak further with her boyfriend, Individual M.

94.    On August 26, 2021, law enforcement officials and Assistant United States Attorney's from the Northern District of Illinois conducted a proffer interview with Individual M. Also present for the interview was Individual M's attorney.

95.    Individual M stated that from approximately January to May 2021, Individual M used fraudulently acquired credit card information to obtain approximately 50 Company E air purifiers and resell the devices for cash at local Chicago-area electronics stores – including Company I. Individual M stated that Company I had a reputation around his neighborhood as a place where a customer could sell new electronic devices and goods for cash.

96.    During the interview, Individual M identified MOSAS and CO-CONSPIRATOR 1 as individuals he/she had interacted with at Company I. Individual M typically sold the Company E air purifiers at Company I for approximately $400 to 450 per package. Individual M always received cash for the air purifiers.

97.     Individual M stated during his first sale of Company E air purifiers at Company I, the individual working in the store conducted an open-source check on a computer inside the store to research the retail price of the air purifier. Individual M negotiated with the Company I employee on the resale price, eventually settling on approximately $400-450 per air purifier. From January to May 2021, Individual M sold several air purifiers at Company I.

### May 2021 Undercover Sale of Nintendo Switch Devices

98.     According to the UCE and a recording, on May 18, 2021, the UCE returned to Crestwood wearing audio and video recording devices. Upon entering the store, the UCE greeted a Crestwood employee, and ZIAD. The UCE also observed an MOSAS in the rear of the store. ZIAD and the UCE met at a counter at the rear of the store and the two exchanged pleasantries. The UCE told ZIAD that he/she had fifteen brand new Nintendo Switches for sale and reminded ZIAD that he previously promised to buy the Nintendo Switches at $260 apiece. ZIAD and MOSAS engaged in a discussion in the rear of the store. ZIAD agreed to the sale and stated that the UCE was getting a better deal for the Nintendo Switches than what was listed on the price list for other customers. The UCE exited the store and retrieved two boxes containing the Nintendo Switches from his/her vehicle in the parking lot and returned to the store. ZIAD paid the UCE $3,900 in cash for the sale of the devices.[20]

---

[20] According to open-source research, the approximate retail value per Nintendo Switch is $299. The total retail purchase price of the devices by law enforcement was $4,871.09.

99. The UCE asked ZIAD for access to the document containing the price list and provided ZIAD with his/her telephone number. ZIAD wrote down the UCE's number and told the UCE he would send the UCE a message from the -9622 number. The UCE and ZIAD generally engaged in a conversation about what additional devices the UCE should try to acquire. ZIAD stated that gaming stations like the Nintendo Switches and Apple products were in high demand. The UCE exchanged good-byes and departed Crestwood.

100. After the sale, in the afternoon on May 18, 2021, the UCE contacted ZIAD through WhatsApp messaging application via the -9622 number. ZIAD replied and sent the UCE a hyperlink to a Google document containing a list of electronic devices and the price point for purchase. WhatsApp records show that the -9622 number was in use on that platform from at least July 21, 2017 to May 13, 2021. Based on interviews and UCE reporting, the ZAYEDs created a comprehensive list of current, high-dollar electronic devices and the price they will pay for each device. Based on UCE reporting, this list is displayed on television and computer screens in their stores and distributed via WhatsApp messenger.

34. WhatsApp records for the -9622 number from approximately December 2020 to March 2021 showed that ZIAD maintained at least four large group chats of approximately 90 to 160 persons each. WhatsApp records show that the group messages were all outbound messages from the -9622 number to other group members, indicating ZIAD used these four group chats as distribution lists.

35.     On or about May 18, 2021, the UCE received messages from the WhatsApp account associated the -9622 number containing a hyperlink which enabled the recipients to access an electronic device price sheet. The price sheet included columns with different device models and numbers for "sealed" and "open" devices. Based on these messages, and WhatsApp records, I believe ZIAD is using his WhatsApp account to share pricing data for electronics.

June 2021 UCE Sale of "Stolen" iPhones

101.     On June 24, 2021, the UCE returned to Crestwood wearing an audio and video recording device. Based on the UCE and the recording, the UCE greeted an unknown Crestwood employee at the entrance before interacting with MOSAS at the rear counter of the store. The UCE stated that he/she had twelve new iPhone 12 cellphones to sell and gave the boxes to MOSAS. The UCE asked MOSAS to take "three of the [SIM cards] out." According to the recording and the UCE, the UCE asked how much the cellphones were worth, to which MOSAS responded by asking what company the cellphones were from. The UCE stated he/she did not know and asked MOSAS to "look it up for me." According to the UCE, MOSAS reviewed a serial number from one of the cellphone boxes, used the calculator on his computer, and proceeded to tell the UCE that the devices were worth $6,660. According to the audio and video recording, a computer screen which displayed a spread sheet with what appeared to be electronic devices and associated prices was visible on the counter next to MOSAS.

102.    Documented in the audio and video recording, MOSAS counted all the cellphone boxes and then asked the UCE if he/she wanted "three SIM cards?" The UCE confirmed, stating "yeah, pull three out. Three should be enough." The video recording showed MOSAS unwrapping the plastic from the new cellphone boxes and removing three SIM cards from the devices. The UCE told MOSAS "I might be able to get a lick and get a whole bunch [of electronic devices], but I'll let y'all know. Like say I get like 50 of them [cellphones], I still bring them all here?" MOSAS responded saying, "as many as you have." The UCE continued, "If I know it's happening, I'll try to give y'all a heads up. I'll hit [ZIAD] up on his cellphone to let him know." As previously discussed, the phrase "hit a lick" is slang for acquiring money quickly. In this instance, based on the context of the conversation, the UCE was referring to selling stolen goods.

103.    According to the video recording, the UCE asked MOSAS what electronic device would get him/her the most money. MOSAS responded, stating: "12 pro max. Those ones you get like $900 for." According to open-source research, the baseline model of the Apple iPhone 12 Pro Max retails for $1,099. The UCE told MOSAS how he/she uses an associate to acquire the cellphones, stating: "The dude can get whatever, I just gotta tell him what to look for. But sometime the way he get it, he don't have time to look through the whole box." According to the audio and video recording, MOSAS acknowledged the UCE's statement by responding "yeah." Based on the audio and video recording and observations from the UCE, MOSAS proceeded to use a money counter under the desk to count $6,660 in cash. The total retail value

26

of the 12 Apple iPhones was $9,600. MOSAS subsequently paid the UCE for the 12 Apple iPhones and gave him/her a small plastic baggie containing three SIM cards.

104. Based on the audio and video recording, observations and statements made by the UCE, MOSAS's responses and actions during the sale, and my training and experience, there is probable cause to believe that MOSAS knowingly bought stolen cellphones from the UCE on June 24, 2021.

105. On June 25, 2021, the Honorable Jeffrey I. Cummings, a United States Magistrate Judge in the Northern District of Illinois signed a search warrant, 21 M 394, for FedEx Express packages shipped on June 25, 2021 from Crestwood.

106. On June 25, 2021, law enforcement agents executed a search of three packages originating from Crestwood at a FedEx Express distribution facility. The shipping labels on the outside of the boxes stated the shipper was "TNF INTL INC", located at an address in Royal Oak, Michigan. Open-source searches indicated the Royal Oak, Michigan address is a large residential apartment complex. Additionally, FedEx records show that TNF INTL INC does not list a specific unit or apartment number at this facility. Based on this information, I believe this is a false address.

107. The boxes were bound for Company J in Hong Kong. A search of the three packages revealed a total of approximately 238 separate electronic devices. Notably, two of the packages contained brand new Apple iPhones in their original packaging, while the third package contained a variety of used cellphones. Law enforcement matched the serial numbers of these phones and confirmed they were the same phones that the UCE sold to MOSAS at Crestwood on June 24, 2021.

## CONCLUSION

108.    Based on the foregoing, I respectfully submit there exists probable cause to believe that, between September 19, 2019 through and including at least June 25, 2021, in the Northern District of Illinois and elsewhere, ZIAD I. ZAYED and MOSAS I. ZAYED conspired to receive, possess, conceal, store, barter, sell and dispose of stolen goods, namely, laptops, smartphones, and other electronics, knowing the goods to have been stolen, and such goods having traveled across state lines after they were stolen, in violation of Title 18, United States Code, Sections 371 and 2315.

FURTHER AFFIANT SAYETH NOT.

WILLIAM R. ZANDER
Special    Agent,    Federal    Bureau    of
Investigation

SWORN TO AND AFFIRMED by telephone October 29, 2021.

Honorable Sunil R. Harjani
United States Magistrate Judge